NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

OHIO NEW AND REBUILT PARTS, INC., and/or Mel's Battery, Inc., Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CANTON HEALTH CARE CENTER, INC., Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COLONIAL GARDENS CARE CENTER, INC., Respondent.

Nos. 83–5785, 84–5283 and 84–5174.

United States Court of Appeals, Sixth Circuit.

Argued March 14, 1985.

Decided April 30, 1985.

Elliott Moore, Deputy Associate Gen. Counsel, Frederick Havard (argued), N.L.R.B., Washington, D.C., Bernard Levine, Director, Region 8, N.L.R.B., Cleveland, Ohio, for petitioner in all cases.

Donald A. Knowlton, Region 8, N.L.R.B., Cleveland, Ohio, for petitioner in No. 84-5283.

Don T. Carmody (argued), Carmody & DiRienzo, New York City, for respondents in all cases.

Robert Leonard, Cory, Leonard, Witter & Cheney, Lima, Ohio, for respondent in No. 83-5785.

Thomas E. Palecek, Palecek, McIlvaine & Foreman, Wadsworth, Ohio, for respondent in No. 84-5174.

Before WELLFORD and MILBURN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

The National Labor Relations Board seeks enforcement of its decisions in three separate proceedings ordering each of the respondents to bargain upon request with a labor organization as representative of the respondents' respective employee units. Reference is made to the reported decisions of the Board for a recitation of pertinent facts.[1]

The three enforcement proceedings have been consolidated, pursuant to a joint motion of the parties, for the purpose of facilitating consideration by this Court of the common defense to the orders raised by each of the respondents.

## I

The parties agree that the principal issue presented to this Court is the constitutionality of the Senior Executive Service provisions of the Civil Service Reform Act of 1978, as applied to NLRB Regional Directors, 5 U.S.C. §§ 3131 et seq., 4311 et. seq. The respondents have stipulated that the Board's orders otherwise are entitled to enforcement, as they are supported by substantial evidence on the respective records.

In urging that enforcement of the Board's orders be denied, all three respondents contend that the provisions of the Civil Service Reform Act of 1978 creating the Senior Executive Service are unconstitutional and deprive respondents of due process and equal protection of the law. Respondents' defenses to the Board's bargaining orders are predicated on the fact that the Board's Regional Director in the present proceedings is a member of the Federal Senior Executive Service, 5 U.S.C.

---

1. Ohio New and Rebuilt Parts, Inc. and Mel's Battery, Inc., 267 NLRB 420 (1983); Canton Health Care Center, 269 NLRB No. 35 (No. 84-5283 March 2, 1984); Colonial Gardens Care Center, 268 NLRB 613 (1984).

§ 3131, and, as such, was subject to the Board's performance appraisal system established pursuant to provisions of the foregoing statute.

Reliance is placed upon the principle, as described by respondents, that a judicial or quasi-judicial proceeding violates the due process clause of the fifth amendment "if there is an indication of any possible temptation to the average person performing quasi-judicial or 'administrative prosecutorial' functions to decide a matter with bias for or against any issue presented." Respondents state that "the legal yardstick, therefore, is *risk of bias,* not actual bias."

It is contended by respondents that the statutory provisions with respect to the Senior Executive Service are unconstitutional because they inject "personal financial interests and other irrelevant and impermissible interests into the administrative and enforcement processes engaged in ... through the N.L.R.B. by linking the pay of Regional Directors ..., who perform both 'quasi-judicial' and 'administrative prosecutorial' functions, to their performance of such functions in their administration of the National Labor Relations Act."

More specifically, respondents assert that as a result of membership of Regional Directors in the Senior Executive Service, "the amount of their compensation is directly dependent upon the particular types of alternative actions they choose to take at any given point during a representation proceeding or an unfair labor practice proceeding.

"The alternative actions to be taken in turn can be influenced by the speed with which the Regional Directors process matters before them."

The arguments of respondents are set forth in further detail in the following paragraphs of their briefs:

"Since in the natural course of events there exists a possible temptation to an average person acting as a Regional Director to process Representation Petitions, either personally or through delegation of authority, with undue emphasis

upon the choice of official actions which serve to offer the Regional Director a better salary, and with further undue emphasis upon the expeditious treatment and disposition of cases toward that same end, there is an impermissible risk of bias—not to mention the glaring appearance of bias—on the part of a Regional Director to decide for or against any issue presented.

"Similarly, in the natural course of events there exists a possible temptation to an average person acting as a Regional Director to process Unfair Labor Practice Charges, either personally or through delegation of authority, with undue emphasis upon the selection of official actions which serve to offer the Regional Director a substantial increase in salary, and with further undue emphasis upon the expeditious disposition and treatment of cases toward that same goal, again resulting in the impermissible risk of biased decisions.

"In addition to violating the 'Due Process' guarantees of the Fifth Amendment, the S.E.S. also denies the Respondents the Equal Protection of the Laws guaranteed by the Fifth Amendment.

"The legislative classification system of the S.E.S. designates (1) the federal agencies which are and are not covered by the S.E.S., (2) the titles of positions authorized to be covered by the S.E.S., and (3) the 'quasi-judicial' functions which are and are not considered as Performance Criteria. This system results in a denial of Equal Protection in that certain persons appearing in various types of administrative proceedings which do not include functions considered as Performance Criteria, and/or who appear before individuals who are not Senior Executives, are not subject to the same denial of Due Process as are the Respondents.

"The disparities in treatment to different groups of persons are not justified by a rational relationship to any legitimate governmental purpose, much less by a compelling government interest.

"Not only as enacted, but as demonstrated herein, in actual practice before the N.L.R.B., the S.E.S. has deprived the Employers of an impartial administrative tribunal in the first instance, thereby violating their rights to Due Process and Equal Protection of the Laws secured under the Fifth Amendment to the United States Constitution.

"By displacing the calculatedly just rule of law with the inevitably selfish rule of personal interest, such a compensation scheme effectively crumbles the foundation of the legal barrier to governmental arbitrariness.

"The Employers are raising *both* Due Process and Equal Protection of the Laws claims.

"Moreover, the Employers challenge 'quasi-judicial' functions performed by the Regional Director in their respective Representation proceedings, and *independently* challenge the 'administrative prosecutorial' and 'quasi-judicial' functions performed by the Regional Director in their respective Unfair Labor Practice proceedings."

## II

The Civil Service Reform Act of 1978 was the most comprehensive revision of the federal civil service since the enactment of the Pendleton Act in 1883. P.L. 95–454, 95th Cong., 2nd Sess., 91 Stat. 1111. *See* S.Rep. No. 95–969, 95th Cong., 2nd Sess., *reprinted in* [1978] U.S.Code Cong. & Ad. News 2723.

The Senior Executive Service is an integral part of the Civil Service Reform Act. The Senate Report describes the purpose of the Senior Executive Service as follows:

*Senior Executive Service*

Despite the critical need to recruit and develop the highest quality Federal executive, no fully effective governmentwide system exists today for selecting, preparing, advancing, and managing the men and women who administer the programs that affect every person in the Nation. At present neither the Congress nor the President has effective control over the size and distribution of executive level employees. In addition, the existing system for designating career and noncareer positions fails to provide adequate protection against politicization of the career service, yet it is so rigid that it fails to provide agency heads with sufficient flexibility to fill critical positions with executives of their own choosing. The current rank-in-position system of classifying jobs limits rotation and reassignment opportunities for career employees and prevents the best use of executive talent. Moreover, it is difficult to reward executives whose work is outstanding, and to reassign or remove executives whose performance is unacceptable. Finally, even with the rigid strictures governing executive employees, there is inadequate protection against political abuse and incompetence.

S. 2640 addresses these and other problems in the staffing and management of senior executive positions by creating a new Senior Executive Service (SES). Most senior positions in grades GS–16 through Executive Level IV will be assigned to SES. They will be subject to removal for inadequate performance, with a guaranteed right to a career position as at least a GS–15 without a loss in pay unless they were removed for misconduct, neglect of duty, or malfeasance. By statute, no more than 10 percent of the positions in the SES may be filled by noncareer executives. This statutory cap on noncareer appointments is an important check against politicization of the SES. Career appointments will be made by the agencies strictly on the basis of managerial merit. Newly appointed SES executives will serve a probationary appointment of one year. Each agency will develop annual performance appraisal systems for SES executives, with written appraisals based on established requirements. Executives will be shown the performance appraisal and rating and given an opportunity to respond in writing and have the rating reviewed at a higher managerial level. SES executives

will be eligible for annual cash performance awards not to exceed 20 percent of their base pay, as well as awards for sustained excellence or sustained extraordinary accomplishments.

In the SES, rank will be based on an executive's individual talents and performance, not the position. Assignments in the SES will be made according to the overall needs of the government, thereby promoting its efficiency. This pattern also will permit more lateral mobility for executives than most presently enjoy. Increased mobility among Federal, State and local agencies and the private sector in turn, will mean decreased parochialism of outlook in the government's top managers.

Evaluation of executives in the SES will be based on their actual performance. Those whose work is exceptional will be eligible for performance awards. In addition, the psychic rewards will be considerable; serving in the SES will be an honor because it will be earned on merit. Those executives who cannot or do not live up to its standards will be removed, but their rights will be protected in a variety of ways. In a removal for misconduct they may appeal to the Merit Systems Protection Board. In unacceptable performance cases there is a detailed process required in the agency. In performance cases they can revert to the regular civil service as a GS–15.

This provision of S. 2640 should foster the development and effective use of senior executives in the Federal service. It is the kind of system that has been highly successful in the private sector, as well. It is an idea that public administrators have been advocating for decades, most notably in the second Hoover Commission report in 1955. *Id.* pp. 2732–33.

Title IV contains one of the most significant elements of the Civil Service Reform Act: Provision for the creation of a corps of top management leaders in a Senior Executive Service. The greatest asset and strength of any government is its top leadership. This is particularly true for the U.S. Government, which is the largest employer in the Nation. Its programs are far-reaching and complex, and they must be conducted with great sensitivity to conflicting public and private interests and with impartiality and compassion. Meeting this great responsibility requires strong executive leadership, which can respond to rapidly changing conditions and circumstances surrounding Federal programs and still chart a course which takes into account the national interest, the achievement of presidential and congressional goals, and simultaneously maintains the soundest management techniques.

The committee believes that the establishment of a Senior Executive Service represents a major step toward the achievement of a goal of the most highly motivated and highly competent Federal service leadership possible.

Title IV provides for the establishment of a new Senior Executive Service to include most of the top executive positions in the Federal service. *Id.* p. 2789.

The provisions of the Civil Service Reform Act of 1978 were designed to enforce the merit principle in the civil service by allowing civil servants to be fired, hired or rewarded upon the basis of performance. 5 U.S.C. § 5384 provides for "performance awards" not exceeding 20% of the executive's base salary, for not more than 50% of the Senior Executive Service positions in the agency.

Appendix A to this opinion sets forth details as to the administration of the Senior Executive Service and the application of its Performance Appraisal System to Regional Directors. Appendix A is taken from the NLRB brief in the present consolidated cases.

Appendix B to this opinion is the Board's Revised Appraisal System for Regional Directors, effective January 1, 1981, and amended April 13, 1982.

### III

Only one judicial decision involving the constitutionality of the statute creating the

Senior Executive Service has been cited to the Court: the unpublished memorandum opinion of the United States District Court for the District of Columbia, styled *Canton Health Care Center, Inc., v. United States*, Civil Action No. 82–2511, filed October 31, 1983.[2] The plaintiffs were two of the respondents in the present case: Canton Health Care Center, Ohio New and Rebuilt Parts, Inc. and Mel's Battery, Inc.

The memorandum opinion of District Judge Harold H. Green stated:

"Plaintiffs challenge the constitutionality of the statute establishing the Senior Executive Service (S.E.S.)[1] on the ground that the compensation scheme established by this program injects 'substantial personal, financial and other irrelevant and impermissible interests' into the administrative and enforcement processes engaged in by employees of the federal government. Plaintiffs, three corporations involved in proceedings before Region 8 of the National Labor Relations Board (NLRB),[2] contend that they were deprived of an impartial administrative tribunal in violation of the Fifth Amendment because the pay of the Regional Directors of the NLRB is improperly linked to their expeditious performance of certain responsibilities. The essence of plaintiffs' theory is that participation by Regional Directors in the S.E.S. results in an undue emphasis on the speed at which matters before the NLRB are resolved, thereby creating an unlawful risk of bias for or against issues presented to the Board. Presently before the Court is defendants' motion to dismiss.

"First. Plaintiffs apparently seek a declaration of unconstitutionality of the entire S.E.S. pay system, at least as it applies to federal employees who perform 'quasi-judicial' or administrative prosecutorial functions. However, the complaint fails entirely to allege any injury to plaintiffs as a result of the government-wide implementation of the S.E.S. program. Only one federal employee who is a member of the S.E.S.—the Regional Director of Region 8 of the NLRB—is alleged to have taken any actions which might have resulted in injury to the plaintiffs. For this reason, plaintiffs lack standing to challenge the legality of the S.E.S. program in its entirety; they have standing at best to challenge only the constitutionality of the S.E.S. as it applies to the performance of functions by the Regional Directors of the NLRB. See *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464 [102 S.Ct. 752, 70 L.Ed.2d 700] (1982).

Plaintiffs' standing cannot be enlarged by characterizing this lawsuit as one challenging the 'interests' created by the S.E.S. system. Such a formulation, if accepted by the Court, would effectively nullify the injury-in-fact requirement, and it would allow plaintiffs to challenge alleged illegal consequences of the program with respect to segments of the federal government having no connection to the proceedings in which they are involved before the NLRB. Indeed, plaintiffs' own description of the complaint confirms that the basis of this action is nothing more than the alleged unconstitutional interests which the S.E.S. injects into actions taken by NLRB Regional Directors.[5]

\*　　\*　　\*　　\*　　\*　　\*

"All of these conclusions are reinforced by the fact that plaintiffs' substantive challenge to the S.E.S. compensation scheme is patently without merit. Even if it be assumed that the NLRB Regional Directors act in a quasi-judicial capacity when considering representation petitions and unfair labor practice charges,[12] there is no basis for the claim of bias in connection with the handling of such matters. An unconstitu-

---

**2.** On September 13, 1982, in the same case, the District Court for the District of Columbia denied plaintiffs' application for a preliminary restraining order to restrain the holding of an NLRB union representation election. The court held that plaintiffs had failed to establish that they were likely to succeed in their charge that the decision of the Regional Director in ordering the election was tainted by a desire to receive merit points improving his chances of obtaining financial awards under the Senior Executive Program. 97 Labor Cases (CCH) ¶ 10,-264.

tional risk of bias is not created simply because officials have been given an incentive to handle matters expeditiously. All employees of the federal government, regardless of whether they are Senior Executives, have—or should have—an incentive to deal with the matters before them on an efficient basis. There is a far and totally unwarranted leap from the premise of an incentive to handle matters expeditiously to the conclusion that this creates an unconstitutional conflict of interest.

"The primary thrust of plaintiffs' complaint appears to be not that the Regional Director of Region 8 is biased against them, but simply that the financial interest which he may have in the speed with which he processes petitions results in a risk of bias 'for or against any issue presented.' Judicial and administrative adjudicators may not, consistently with due process, have a financial interest in the matter which is the subject of ... administrative proceedings. See, e.g., *Gibson v. Berryhill, supra; Ward v. Village of Monroeville,* 409 U.S. 57 [93 S.Ct. 80, 34 L.Ed.2d 267] (1972); *Tumey v. Ohio,* 273 U.S. 510, 532 [47 S.Ct. 437, 444, 71 L.Ed. 749] (1927). But an administrator does not have such interest merely because he may be motivated to resolve proceedings themselves expeditiously.[14]

It might finally be noted that the speed at which matters are resolved is only one factor among several in the S.E.S. incentive awards system. See note 1, *supra.*[15] If anything, it seems that due process guarantees would more likely be violated if administrators had no incentive to process matters efficiently and with an emphasis on quality than is true under the present scheme.

"[1] See 5 U.S.C. §§ 5381 *et seq.* The S.E.S., which became effective on July 13, 1979, is a system of compensation for employees of the federal government above the rank of GS–15 and below Level III of the Executive Schedule, with certain exceptions (*e.g.,* members of the judicial branch, administrative law judges, and positions filled by Presidential appointment with the consent of Congress). The central feature of the S.E.S. program is the grant on an annual basis of monetary awards which are added to the Senior Executive's base salary.

Selection for these awards is based on the following criteria: (1) improvements in efficiency, productivity, and work quality, (2) cost efficiency, (3) timeliness of performance, (4) success in meeting affirmative action goals, and (5) indications of the effectiveness, productivity and performance quality of the employees for whom the Senior Executive is responsible. See 5 U.S.C. §§ 4313, 5382–84.

"[2] Two of the plaintiffs—Ohio New & Rebuilt Parts, Inc. and Mels Battery, Inc.—are defending unfair labor practice charges which are before an administrative law judge of the NLRB. The third plaintiff—Canton Health Care Center, Inc.—initially sought to enjoin a representation election among certain of its employees, which had been ordered by the NLRB. On September 13, 1982, Judge Joyce Hens Green denied the request for a temporary restraining order, and the representation election was subsequently held. The employees voted to unionize, leading Canton Health Care Center, Inc. to file objections with the NLRB.

"[5] Plaintiffs summarize their complaint as follows:

[T]he Complaint alleges that the S.E.S. injects substantial personal, financial interests and other irrelevant and impermissible interests into the performance by the Regional Directors of 'quasi-judicial' and 'administrative prosecutorial' functions so as to offer a possible temptation to the average person performing such functions to decide with bias for or against any issues presented.

"[12] See *Gibson v. Berryhill,* 411 U.S. 564, 579 [93 S.Ct. 1689, 1698, 36 L.Ed.2d 488] (1973).

"[14] For the same reasons, plaintiffs' claims that the Regional Directors' participation in the S.E.S. program violates the policy goals set forth in the Federal Criminal Bribery, Graft and Conflict of Interest statute, 18 U.S.C. § 201 *et seq.,* as well as several other executive orders designed to prevent conflicts of interest, are without merit.

"[15] The NLRB itself noted in *French Hospital Medical Center,* 254 NLRB 711, 711 n. 3 (1981) that

the rapidity with which representation cases are processed is but one of many factors considered under the Senior Executive Service compensation plan. Another factor is the quality of the Regional Director's decisions and the percentage of reversals by the Board."

The Court of Appeals for the District of Columbia affirmed the District Court in an unpublished order on the ground of lack of standing. *Canton Health Care Center, Inc. v. United States,* 750 F.2d 1093 (D.C. 1984).

In the proceedings before the Board against respondent Canton Health Care Center, the Board issued its decision and

bargaining order on March 21, 1984, finding that Canton had refused to bargain with the Union in violation of 29 U.S.C. § 158(a)(5) and (1). The Board noted that it had denied Canton's August 26, 1982 request for review based on the alleged unconstitutionality of the Senior Executive Service.

In *French Hospital Medical Center*, 254 NLRB 711 (1981), the Board found that the rulings of the Regional Director on interim appeals were "free of prejudicial error." In a footnote, the Board said:

During the hearing the Employer challenged the Regional Director's ability to make unbiased interim rulings regarding various objections and its request for a continuance. The Employer asserts that the Regional Director as a member of the Senior Executive Service established by the Civil Service Reform Act of 1978, 5 U.S.C. 2301, *et seq.*, could receive a bonus. One of the elements used to determine whether or not she receives a bonus, and its amount, is the speed with which representation cases are processed within her Region. The Employer claims that the Regional Director made adverse interim rulings and denied its request for a continuance because of pecuniary interest, thereby violating its right to due process.

The constitutionality of the Senior Executive Service appears to be a question of first impression among the Courts of Appeals. The Supreme Court, however, has addressed the standards applicable in determining whether a government official performs his duties with impermissible bias. In *Schweiker v. McClure*, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) the Court was presented with a due process challenge to the adequacy of procedures for reviewing an insurance carrier's refusal to pay claims filed under the Medicaid program. Review of the carrier's decision not to pay a claim was available through a "review determination" by another employee of the same carrier. Further review was available for claimants at an oral hearing presided over by an officer chosen by

the carrier. 456 U.S. at 191, 102 S.Ct. at 1668.

Justice Powell, for a unanimous Court, wrote:

The hearing officers involved in this case serve in a quasi-judicial capacity, similar in many respects to that of administrative law judges. As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities. *E.g., Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242–243, and n. 2 [100 S.Ct. 1610, 1613–1614, and n. 2, 64 L.Ed.2d 182] (1980). We must start, however, from the presumption that the hearing officers who decide Part B claims are unbiased. See *Withrow v. Larkin*, 421 U.S. 35, 47 [95 S.Ct. 1456, 1464, 43 L.Ed.2d 712] (1975); *United States v. Morgan*, 313 U.S. 409, 421 [61 S.Ct. 999, 1004, 85 L.Ed. 1429] (1941). This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification. See *Gibson v. Berryhill*, 411 U.S. 564, 578–579 [93 S.Ct. 1689, 1697–1698, 36 L.Ed.2d 488] (1973); *Ward v. Village of Monroeville*, 409 U.S. 57, 60 [93 S.Ct. 80, 83, 34 L.Ed.2d 267] (1972). See also *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942] (1955) ("to perform its high function in the best way 'justice must satisfy the appearance of justice'") (quoting *Offutt v. United States*, 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11] (1954)). But the burden of establishing a disqualifying interest rests on the party making the assertion.

Fairly interpreted, the factual findings made in this case do not reveal any disqualifying interest under the standard of our cases. 456 U.S. at 195–96, 102 S.Ct. at 1670.

\* \* \* \* \* \*

"[D]ue Process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). We have considered appellees' claims in light of

the strong presumption in favor of the validity of congressional action and consistently with this Court's recognition of "congressional solicitude for fair procedure...." *Califano v. Yamasaki,* 442 U.S. 682, 693 [99 S.Ct. 2545, 2553, 61 L.Ed.2d 176] (1979). Appellees simply have not shown that the procedures prescribed by Congress and the Secretary are not fair or that different or additional procedures would reduce the risk of erroneous deprivation of Part B benefits. 456 U.S. at 200, 102 S.Ct. at 1672.

There is a strong and firm presumption that governmental officials, such as the Regional Director, perform their functions without bias. *Schweiker, supra,* 456 U.S. at 195, 102 S.Ct. at 1670; *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). This presumption can be rebutted, *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973), but the burden of establishing a disqualifying interest is upon the person making that contention. *Schweiker, supra,* 456 U.S. at 196, 102 S.Ct. at 1670. The impermissible interest that would motivate bias must be realistic and more than "remote." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 250, 100 S.Ct. 1610, 1617, 64 L.Ed.2d 182 (1980).

Respondents in the present case contend that the Regional Directors have a financial stake in their decisions because of the *possibility* of receiving performance awards. For this proposition they cite cases in which a quasi-judicial or judicial officer had a *direct* financial interest affected by his decisions, such as *Tumey v. Ohio,* 273 U.S. 510, 531, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927) (mayor acting as judge shared in the fees and costs levied by him) and *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (mayor responsible for village finances could not act as judge when fines and forfeitures provided a substantial portion of village funds). There is no showing that Regional Directors have any comparable possibility of a financial stake in their decisions.

The presumption of impartiality of Regional Directors is complemented by the authority of Congress to regulate completely the positions of federal civil servants. *Ramspeck v. Federal Trial Examiners Conference,* 345 U.S. 128, 73 S.Ct. 570, 97 L.Ed. 872 (1953); *see also Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), holding that due process analysis requires balancing of governmental interest in existing procedures against the risk of erroneous deprivation of a private interest through the use of these procedures.

The Board's appraisal system for Regional Directors (see Appendix B to this opinion) embraces each of the factors set forth in the Civil Service Reform Act, 5 U.S.C. § 4313.

Critical Elements used to assess the performance of a Regional Director are: (1) Effectiveness and Efficiency of Performance; (2) Quality of Casehandling; (3) Achievement of Agency Objectives; and (4) Staff Relations. Respondents distort the significance of the first "Critical Element" and down play the importance of the other three elements. They claim that the first element tempts the Regional Director to dispose of matters with reckless speed in an effort to earn a "performance award." This contention ignores the fact that the second, third and fourth critical elements each allow a maximum of 25 points, the same as the first. Appendix B to this opinion lists the nine factors weighed by the Board in determining the appropriate point award (up to 25) for effectiveness and efficiency of performance.

We hold that the record in the present case does not support the blanket allegation of respondents that the Board's appraisal system offers an incentive to Regional Directors to perform their duties with a bias toward outcomes that will enhance their opportunity to receive a performance award.

We conclude that the provisions of the Civil Service Reform Act of 1978, creating the Senior Executive Service and applied to NLRB Regional Directors, are valid consti-

tutional enactments and that respondents have not established that they have been deprived of due process or equal protection of the law.

## IV

In the order of the Board reported at 267 NLRB 420, Case No. 83–5785, respondents Ohio New and Rebuilt Parts, Inc. and Mel's Battery, Inc. are required upon request to recognize and bargain with Truck Drivers, Warehousemen and Helpers Union Local No. 908, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, as the exclusive representative of all employees in the appropriate bargaining unit.

In its order reported at 269 NLRB No. 35, Case No. 84–5283, respondent Canton Health Care Center, Inc. was required on request to bargain with the United Food and Commercial Workers Union Local 698, AFL–CIO–CLC as the exclusive representative of all employees in the appropriate unit.

In its order reported at 268 NLRB 613, case No. 84–5174, respondent Colonial Gardens Care Center, Inc. was required on request to bargain with the United Food and Commercial Workers Union Local 698, AFL–CIO as the exclusive representative of the employees in the bargaining unit.

The respondents have stipulated that the orders of the Board are supported by substantial evidence on the respective records.

Enforcement of all three of the orders of the Board is granted. No costs are taxed. The parties will bear their own costs in this Court.

## Appendix A

### Application of Senior Executive Service Appraisal System to NLRB Regional Directors

[A]mong the major provisions governing the Senior Executive Service are:

compensation system, including "incentives," to attract and retain competent executives, and a system that makes an executive's compensation, retention, and tenure contingent on successful performance of his duties (5 U.S.C. 3131). The link between an executive's compensation, retention, and tenure and his level of performance is obtained by way of the comprehensive performance appraisal system. (5 U.S.C. 4312, et seq.) Each agency is responsible for the development of its own appraisal system. The system should "encourage excellence of performance" (5 U.S.C. 4312(a)(3)) and provide (1) "accurate evaluation of performance ... on the basis of criteria ... related to the position and which specify the critical elements of the position" (5 U.S.C. 4312(a)(1)); (2) appraisals on a systematic basis (5 U.S.C. 4312(a)(2)); and (3) a basis for determining the executive's eligibility for remaining in the Senior Executive Service or receiving a performance award (5 U.S.C. 4312(a)(4)).

Evaluation of the executive's performance is statutorily mandated to consider such individual and organizational performance factors as the following five (5 U.S.C. 4313):

1. improvements in efficiency, productivity, and quality of work or service, including any significant reduction of paperwork;
2. cost efficiency;
3. timeliness of performance;
4. other indications of the effectiveness, productivity, and performance of the employees for whom the senior executive is responsible; and
5. meeting affirmative action goals and achievement of equal employment opportunity requirements.

The evaluation system is monitored in each agency by a "performance review board" that reviews the initial evaluation of an executive's performance by his immediate supervisors, considers the executive's response to the initial evaluation, if any, and then makes recommendations to the agency's head concerning the evaluation (5 U.S.C. 4314(c)(1)–(3)). These appraisals of the executive are done on an annual basis. They summarily rate the executive's performance as being at one or more successful levels, a minimally satisfactory level, or

an unsatisfactory level. (5 U.S.C. 4314(a)). An executive may be eligible for a performance award if he receives a fully successful rating (5 U.S.C. 5384(a)(1), (b)(1)), or he may be transferred, reassigned, or removed from the Senior Executive Service if he receives an unsatisfactory rating (5 U.S.C. 4314(b)(3) and (4)), with removal from the Service being required if in two of five consecutive years he receives an unsatisfactory rating or in two of three consecutive years he receives less than a fully successful rating (5 U.S.C. 4314(b)(2)–(4)).

An executive who receives a fully successful rating may be eligible for a performance award, the statutory incentive to "encourage excellence in performance by career appointees" (5 U.S.C. 5384(a)(1)). The performance review board at each agency recommends to the agency head which executives should receive performance awards (5 U.S.C. 5384(c)). The amount of the performance award is determined by the head of the agency, but cannot exceed 20 percent of the executive's base salary (5 U.S.C. 5384(b)(2)). The number of executives receiving such awards in any agency cannot exceed 50 percent of the number of executives in the agency (5 U.S.C. 5384(b)(3)). In addition, agencies on an annual basis may recommend to the Office of Personnel Management career executives who, on account of performance, warrant the rank of Meritorious Executive or Distinguished Executive. Those ranks, if granted by the President upon the recommendation of the Office of Personnel Management, entitle the Meritorious Executive to a $10,000 lump sum award and entitle the Distinguished Executive to a $20,000 lump sum award (5 U.S.C. 4507).

Pursuant to 5 U.S.C. 3132(a)(2) and Section 413 of the Civil Service Reform Act, the Board designated the position of Regional Director as a Senior Executive Service position. As of July 1, 1979, the effective date of the governing statute, all of the Board's Regional Directors had voluntarily converted from their general schedule status to the status of members of the Senior Executive Service.

Pursuant to the statutory prescription, the Board developed an appraisal system suited to the position and responsibilities of the Regional Director; the appraisal system was approved by the Office of Personnel Management on December 30, 1979 (S.A. 5, 12–19).

There are four "critical elements" under which the Regional Director is evaluated on an annual basis: (1) "Effectiveness and efficiency of performance;" (2) "Quality of casehandling"; (3) "Achievement of agency objectives;" (4) "Staff relations including development and training of subordinates." Performance under each of the four critical elements is of equal importance, 25 points being the maximum weight assigned to each, for a potential total of 100. The determination of how many points a Regional Director is awarded under each element is dependent on whether and to what extent the Regional Director has satisfied certain goals specified in sub-headings of the critical elements. (S.A. 15–19.)

Under critical element I, effectiveness and efficiency of performance, the Regional Director is evaluated on how well he attains certain goals in the performance of nine specified responsibilities ("performance factors"): (1) Settlement agreements should be reached in 82.6 percent of the meritorious unfair labor practice cases; (2) Election agreements should be reached in 80 percent of relevant representation cases; (3) Regional Director decisions required prior to elections should issue in a median of 45 days from the filing of a representation petition—that is, half of those decisions should issue in 45 days or less and half may issue in 45 days or more;[9] (4) Post-election reports, decisions and supplemen-

---

9. In other words, where a performance factor is expressed in terms of a median number of days, for example, 45 days for issuance of a pre-election decision, the Regional Director fully meets that goal if only half of the evaluated actions are taken in that number of days or less. Since the performance factor is not an "average," the Regional Director who meets the median is not helped additionally by determinations that take less than, for example, 45 days, or harmed if half the determinations take longer than 45 days.

tal decisions should issue in a median of 40 days from the filing of objections and/or ballot challenges; (5) elections should be conducted in a median of 50 days from the filing of a petition; (6) complaints should issue in a median of 45 days from the filing of charges; (7) the Regional Director's determinations on unfair labor practice charges should be implemented in a median of 45 days from the filing of the charge in 98 percent of the cases; (8) 95 percent of cases in which a Board decision or Court order has been received should be closed within 80 days; (9) Priority cases should be handled in accordance with GC memorandum 77–9. (S.A. 15–16, 29–31.)

The determination of the extent to which a Regional Director has been successful or unsuccessful in satisfying those specific performance factors under critical element I includes an evaluation of the extenuating circumstances that existed during the relevant appraisal period (S.A. 15 n. 1):

> Illustrative factors of extenuating circumstances that may be considered are the following: serious travel problems; suboffices; regional offices understaffed; handling of exceptionally time-consuming cases(s); large number of priority cases; exceptionally inclement weather (snow, etc.); exceptionally inexperienced professional staff; highly significant improvement in overall performance; exceptionally large numbers of supervisors and regional management used for Agency training purposes; excessive number of foreign speaking persons involved in case(s); and size of regional office staff.

The assignment of the number of points, out of a maximum of 25, that a Regional Director receives under any of the four critical elements is, in major part, a subjective judgment about what the Regional Director's performance, as measured against the performance factors, means when viewed in the light of the total circumstances in which the Regional Director was required to perform. For the Court's information, a sanitized appraisal of a Regional

Director has been included in the Supplemental Appendix. (S.A. 47–56.)

Review of the Regional Director's performance under critical element I is an ongoing process conducted by the Assistant General Counsels of the Division of Operations Management. The continuous monitoring of the Region's performance is described in DeSio and Higgins "The Management and Control of Case Handling, Office of the General Counsel, NLRB," 2 *The Bureaucrat*, 385 (1974). On a monthly basis, the Regional Director submits to the Assistant General Counsel responsible for his Region a monthly report that reflects information on actions taken in cases. The Regional Director is required to explain why any case has not yet been processed to that stage of the proceeding where, under time standards, it would ordinarily be expected. The data received from the Regions on their caseload is tabulated and organized into statistics and then reviewed by the Assistant General Counsel, who, in turn, reports his analysis of the Region's work performance back to the Region with suggestions for improvements (id. p. 391):

> Briefly then, a Regional Director receives on a monthly basis a review of the performance of his office which is available both to Washington and Region staff. It identifies areas for improvement and provides a continuum of short-range case handling objectives. The Regional Director also receives a series of charts which, without identifying the standing of the other regions, reflects his standing in comparison to other Regional Offices.

With respect to the time standards outlined in critical element I of the appraisal system, they for the most part pre-date the Senior Executive Service and its requirements. Thus, as DeSio and Higgins point out (id. at 385, 389–390), the time standards were the result of an intense effort by the Board to eliminate delays in the processing of cases, a matter which for many years prior to the adoption of these standards was the source of much criticism directed

at the Board. The performance evaluation system now incorporated under critical element I has been in place at the Board since 1959, and the Regional Directors have since then been required to perform their jobs in accordance with the goals that system established. See "Twenty Years of Productivity" 2 *Performance* No. 1 (U.S. Office of Personnel Management, February, 1981) (S.A. 41–46).

Critical element II—quality of casehandling—outlines the procedures by which the quality of the work done in the Regional Offices is assessed. On a random basis, files at the Regional Offices are reviewed to determine the appropriateness of actions taken in cases, including, as here, decisions and directions of elections; to determine whether actions taken are in "conformity with law, Agency regulations, policies, and procedures;" and to determine the completeness of investigations. Also, the particular documents issued by the Region, such as settlement stipulations, pleadings and complaints, are scrutinized for their quality. In addition, there is a review of the "[r]eversal of decisions of the Regional Director" factor that considers (S.A. 18):

1. Reversals on appeals of C cases [unfair labor practice cases]
2. Reversals of pre-election RD Decisions or dismissals of R cases [representation proceedings] (based on other than change in policy)
3. Reversals of RD Decisions objections/challenges based on other than change in policy.

The review of the performance factors under critical element II is also a continuous process. Thus, the Assistant General Counsels of the Division of Operations Management pay the Regional Offices frequent visits "to discuss all aspects of Regional Office work, including the quality of the work of the office and its personnel management and labor relations ... [and] conducts an audit of closed case files." DeSio and Higgins "The Management and Control of Case Handling, Office of the General Counsel, NLRB" 2 *The Bureaucrat* 385, 391 (1974); see also "Twenty

Years of Productivity" 2 *Performance* No. 1 at p. 4 (U.S. Office of Personnel Management, February, 1981) (S.A. 44).

The Board's appraisal system also includes an evaluation of how well the Regional Director performs in meeting agency objectives—critical element III (S.A. 18). Under this element, the Regional Director is assessed on maintaining good public relations, conforming to the Board's personnel and administrative regulations and policies, appropriately utilizing staff, and supporting agency programs such as interregional cooperation. Critical element IV (S.A. 19) assesses the Regional Director's performance in implementing the Board's national equal employment opportunity plan, the collective bargaining agreement between the Board and its employees, and the staff relations program, including the development and training of subordinates.

Under the Board's appraisal system, there is a four-tier rating procedure (S.A. 9–10):

a. *Highly Successful Performance:* exceeds established standards for fully successful performance in all or most critical elements and fully meets standards in the remainder.

b. *Fully Successful Performance:* fully meets the standard for this position in all critical elements.

c. *Minimally Satisfactory Performance:* needs to improve performance in one or more significant factors of critical elements.

d. *Unsatisfactory Performance:* performance is below expected standards in one or more critical elements to an extent which adversely impacts organizational effectiveness.

In order for a Regional Director to be eligible for a performance award, he must be rated either "highly successful" or "fully successful." A performance award is not, however, necessarily granted in any given year to an eligible Regional Director merely because he has attained more points than another eligible Regional Director. The Board has never recommended a Sen-

ior Executive for a "Distinguished Executive" or "Meritorious Executive" rank.

## Appendix B

### Appraisal System for Regional Directors

Attached hereto is the modified Directors' performance plan which has been developed in consultation with you over the past several months. The plan will be used for the appraisal period which ended December 31, 1980 as well as for the subsequent appraisal period which covers the calendar year 1981. The modifications are discussed below.

The four Critical Elements are weighted equally. Under the new system, there will be no bonus points in the evaluation process or performance bands under the first Critical Element. Extenuating circumstances, such as those listed in footnote 1 of the performance plan, will, of course, continue to be considered.

The goal for Settlement Agreements for the period ending December 31, 1980, is 82.6 percent which is the cumulative rate achieved nationally for the preceding appraisal period which ended February 29, 1980. The settlement goal for subsequent appraisal periods will also be based upon the cumulative settlement rate for the preceding appraisal period. We will advise you of the settlement figure which will be used for the appraisal period beginning January 1, 1981, when we have the cumulative rate for the period ending December 31, 1980.

The standard for Post Election Proceedings, including hearing and nonhearing cases, is 40 median days for the appraisal period which ended December 31. Beginning January 1, 1981, however, we will evaluate hearing cases separately from cases processed by way of administrative investigations. The time goal for hearing cases—which includes cases in which hearing officer reports, supplemental decisions and decisions were issued—will be a median of 90 days, and for nonhearing cases it will be a median of 35 days. If the Agency adopts the *Claxton* approach for processing objections and challenges, we will reconsider the time goal for hearing cases with the view of establishing separate goals for report cases and cases in which decisions or supplemental decisions issue. With respect to Elections, the new time goal for conducting elections is 50 median days which is in line with our national experience. As to 45-Day Cases Within Control, the revised standard is 98 percent of the Region's dispositions within 45 days of the filing of the charge. Again, our national experience demonstrates that most Regions have been achieving this percentage. Similarly, the revised standard for Unexcused Overage Compliance Cases—95 percent of the Region's compliance cases closed within 80 days of the receipt of the Board Order or Court Decision—is based upon our national experience. Both of these factors will be measured cumulatively. And finally, with respect to the quality of Advice and Appeals submissions, any deficiencies will be noted in the appraisal so that corrective action can be taken.

We wish to clarify the manner in which priority cases and EEO goals are evaluated. With respect to priority cases, we will continue to take into account the volume of these cases the Regions handle and their impact upon the handling of other cases.

The criteria for evaluating EEO goals remains the same. However, the Director's appraisal will be based upon his or her contribution toward achieving the goals *during* the appraisal period. We will not penalize a Director for not meeting a goal when the circumstances which occurred during the appraisal period did not provide a reasonable opportunity for doing so. For example, the fact that the Region was not able to hire employees during the appraisal period would clearly justify not meeting the goal.

The procedure for the appraisal period ending December 31, 1980 will be essentially the same as the one used for the initial

evaluations. The time frames have been adjusted so that at least 120 days[1] will elapse before the summary ratings are finally issued. The significant steps in the appraisal process are outlined in this paragraph. The Directors have already been advised that they should promptly submit pre-appraisal comments to their Assistant General Counsels, if they wish to do so. The Assistant General Counsels will issue the initial evaluations and summary ratings by March 10. The summary ratings will continue to be: highly successful (81 to 100 points), fully successful (64 to 80 points), minimally satisfactory (40 to 63 points) and unsatisfactory (below 40 points).

If it is necessary for the Assistant General Counsels to formulate guidelines for evaluating the Directors, the Directors' Committee will be involved in the discussions that lead to such guidelines. Copies of any such guidelines will be provided to all Directors. The Directors who wish to seek review of their appraisals must submit the "Request" and supporting comments to Associate General Counsel Joseph E. DeSio by March 30. The Associate General Counsel will grant a *de novo* review of the submissions, will issue his written responses, and will forward the appraisal packages to the Performance Review Board by April 17. The PRB presently consists of the Deputy General Counsel, the Deputy Associate General Counsel, Division of Operations Management; Associate General Counsel, Division of Advice; the Executive Secretary, and the Director of the Office of Representation Appeals. The PRB will complete its review and make its recommendations to the General Counsel by May 20. The General Counsel will consult with the Board and the final summary ratings and bonuses will issue by June 26, 1981.

I wish to again express my appreciation to all the Directors and the Director's Committee for the assistance provided in developing the revisions to the performance plan. We intend to continue to review Critical Elements and Performance Standards and to make additional changes where experience demonstrates that modifications are warranted. We believe that the revised system will enable the Agency to appropriately recognize and reward its Directors.

W.A.L.

Attachment

## CRITICAL ELEMENTS OF REGIONAL DIRECTOR POSITION TOGETHER WITH THE PERFORMANCE FACTORS COMPRISING EACH CRITICAL ELEMENT[1]

**CRITICAL ELEMENT ONE:** (25 points)

**EFFECTIVENESS AND EFFICIENCY OF PERFORMANCE:**

*Settlement Agreements:* The assessments will be based upon the Region's success in achieving an 82.6 percent settlement rate.

*Election Agreements:* The assessment will be based upon the Region's success in achieving an 80 percent election agreement rate.

*Regional Director Decision (pre-election):* The assessment will be based upon the Region's success in issuing its Regional Director Decisions within a median of 45 days from the filing of the petitions.

---

1. Section 4314(b)(1)(C) of the Civil Service Reform Act precludes the Agency from issuing final summary ratings within 120 days after the beginning of a new Presidential administration.

1. Exceptional and/or improved performance in the critical elements as well as extenuating circumstances will be considered in appraising the Directors. Illustrative factors of extenuating circumstances that may be considered are the following: serious travel problems; Suboffices;

Regional Office understaffed; handling of exceptionally time-consuming cases(s); large number of priority cases; exceptionally inclement weather (snow, etc.); exceptionally inexperienced professional staff; highly significant improvement in overall performance; exceptionally large numbers of supervisors and Regional management used for Agency training purposes; excessive number of foreign-speaking persons involved in case(s); and size of Regional Office staff.

*Post Election Proceedings:* [2] The assessment will be based upon the Region's success in issuing its Reports, Decisions and Supplemental Decisions in post-election proceedings within a median of 40 days from the filing of the objections/challenges.

*Elections:* The assessment will be based upon the Region's success in conducting elections within a median of 50 days from the filing of the petitions.

*Complaints:* The assessment will be based upon the Region's success in issuing its complaints within a median of 45 days from the filing of the charges.

*Percentage of 45-day Cases Within Control:* The Assessment will be based upon the Region's success in implementing 98 percent of its determinations within 45 days of the filing of the charges.

*Percentage of Unexcused Overage Compliance Cases Within Control:* [3] The assessment will be based upon the Region's success in closing 95 percent of its compliance cases within 80 days of its receipt of the Board Order or Court Decision.

*Priority Cases:* The assessment will be based upon an overall analysis of priority casehandling performance in accordance with GC Memorandum 77–9.

**CRITICAL ELEMENT TWO:** (25 points)

**QUALITY OF CASEHANDLING:**

Assessment will be based on:

A. Litigation results with appropriate consideration for merit factors and settlement rates.

B. Quality Review of *R* and *C* closed case files to include:

**2.** This performance factor evaluates hearing and nonhearing cases. In hearing cases, it includes: Hearing Officer reports in stipulation for certification cases, supplemental decisions in directed cases, and decisions in consent cases. In nonhearing cases it includes: Reports in stipulation for certification cases, supplemental decisions in directed cases, and decisions in consent cases. Beginning January 1, 1981, the time goal for hearing cases will be a median of 90 days,

1. Review will include at least the cases listed below, of which a significant number will be nonmerit cases:

| 15 CA cases | ) Review recently closed |
| 10 CB cases | ) cases—withdrawals |
| 5 priority cases | ) dismissals not appealed and informal settlements/adjustments |

10 R case files including some cases in which RD Decisions or Reports on Objections and Challenges have issued.

2. The appropriateness of actions taken in the case including the correctness of ultimate decision.

3. The completeness of the investigation.

4. Whether the file is self-contained.

5. Conformity with law, Agency regulations, policies and procedures.

6. Review recent withdrawals to determine conformance with General Counsel's Information Officer Program, extent of investigation beyond initial affidavit and interval between filing and approval of withdrawal.

Any deficiencies noted will be promptly communicated to the Director so that corrective action can be taken during the appraisal period. The Director will not be penalized for deficiencies that are corrected prior to the follow-up review.

C. A review of the quality of casehandling documents issued by the Region or submitted to Washington to include:

1. Submissions to Advice and Appeals.

2. Recommendations for enforcement, miscellaneous litigation, and contempt, including the adequacy of compliance efforts.

3. Formal Settlement Stipulations.

and for nonhearing cases will be a median of 35 days. If the Agency adopts the *Claxton* approach for processing objections and challenges, these time goals will be reconsidered.

**3.** This factor evaluates the timeliness of compliance in cases in which a Board Order or Court Decision has issued.

4. Regional Director Decisions.

5. Quality of pleadings, including complaints and analyses contained in transmittal memoranda.

6. Reports on Objections and Challenges.

D. Conformity with Agency casehandling regulations, policies and procedures.

E. Reversal of decisions of the Regional Director.[4]

1. Reversals on appeals of *C* cases.

2. Reversals of pre-election RD Decisions or dismissals of *R* cases (based on other than change in policy).

3. Reversals of RD Decisions objections/challenges based on other than change in policy.

## CRITICAL ELEMENT THREE: (25 points)

### ACHIEVEMENT OF AGENCY OBJECTIVES:

Assessment will be based on:

A. Maintenance and fostering of good relations with the public. Conduct of, or participation in educational and labor-management relations meetings to include at least one Regionally sponsored conference with representatives of management and labor; and taking the initiative to maintain successful relations with the Bar and the public.

B. Conformance with Agency personnel and administrative regulations and policies.

C. Appropriate utilization of the Region's staff and fiscal resources. The Director will be evaluated on the extent to which any deficiency is corrected.

D. Support of other Agency Programs: Regional support and implementation of Agency programs, including General Counsel's special emphasis programs such as: the Cooperative Education Programs, the Information Officer Program, and the Inter-Regional Cooperation Program. The Director will be evaluated on the extent to which the programs are carried out.

## CRITICAL ELEMENT FOUR: (25 points)

### STAFF RELATIONS INCLUDING DEVELOPMENT AND TRAINING OF SUBORDINATES:

A. Staff Relations

1. EEO

The Regions should implement the National Plan and develop and implement the Local Plan in an effective, appropriate and timely manner.

2. Labor Relations

Administers National Agreement in an effective, appropriate and timely manner.

Administers local labor relations programs in an effective, appropriate and timely manner.

3. Sound overall Program of Staff Relations.

B. Development and Training of Subordinates.

Assessment will be based on:

1. Development and implementation of local training programs for employee and supervisory staff in accordance with established Agency guidelines.

2. Timely and accurate appraisal of subordinates in conformity with Agency guidelines, including supervisors and managers.

3. Counseling members of the supervisory and managerial staff; and insuring participation and support of managerial and supervisory development programs.

### OFFICE OF THE GENERAL COUNSEL

MEMORANDUM April 13, 1982

TO: All Regional Directors
FROM: William A. Lubbers, General
 Counsel

SUBJECT: Performance Factors for Critical
 Element I for Appraisal Period
 January 1, 1982 through
 December 31, 1982

After consultations with the Regional Directors' Committee, we have established the performance factors under Critical Ele-

---

**4.** The quality of the decision as well as the percentage of reversals will be considered.

ment I for the current SES appraisal period. The standard for Settlement Agreements has been raised from 82 to 84 percent, and the standard for Post-Election Proceedings in which hearings are held has been changed from 90 to 95 median days.

The remaining performance factors in Critical Element I were not modified. For your convenience, the Critical Element I factors for the current appraisal period are set forth below.

*Settlement Agreements:* the assessment will be based upon the Region's success in achieving an 84 percent settlement rate.

*Election Agreements:* the assessment will be based upon the Region's success in achieving an 80 percent election agreement rate.

*Regional Director Decisions* (pre-election): the assessment will be based upon the Region's success in issuing its Regional Director Decisions within a median of 45 days from the filing of the petitions.

*Post-Election Proceedings (hearings):* the assessment will be based upon the Region's success in issuing its Reports, Decisions and Supplemental Decisions in post-election proceedings within a median of 95 days from the filing of the objections/challenges.

*Post-Election Proceedings (nonhearing):* the assessment will be based upon the Region's success in issuing its Reports, Decisions and Supplemental Decisions in post-election proceedings within a median of 35 days from the filing of the objections/challenges.

*Elections:* the assessment will be based upon the Region's success in conducting elections within a median of 50 days from the filing of the petitions.