# SCHWEIKER, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* McCLURE ET AL.

No. 81–212.   Argued March 1, 1982—Decided April 20, 1982

POWELL, J., delivered the opinion for a unanimous court.

*Deputy Solicitor General Geller* argued the cause for appellant. With him on the briefs were *Solicitor General Lee, Edwin S. Kneedler, Lynne K. Zusman, Robert P. Jaye,* and *Henry Eigles.*

*Harvey Sohnen* argued the cause for appellees. With him on the brief were *Stefan M. Rosenzweig, Clifford Sweet, Sally Hart Wilson,* and *Gill Deford.**

JUSTICE POWELL delivered the opinion of the Court.

The question is whether Congress, consistently with the requirements of due process, may provide that hearings on disputed claims for certain Medicare payments be held by private insurance carriers, without a further right of appeal.

I

Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U. S. C. § 1395 *et seq.* (1976 ed. and Supp. IV), commonly known as the Medicare program, is administered by the Secretary of Health and Human Services. It consists of two parts. Part A, which is not at issue in this case, provides insurance against the cost of institutional health services, such as hospital and nursing home fees. §§ 1395c–1395i–2 (1976 ed. and Supp. IV). Part B is entitled "Sup-

---

*Briefs of *amici curiae* urging affirmance were filed by *David R. Brink* for the American Bar Association; and by *Mary Ellen McCarthy* for Coalition of Senior Citizens, Inc., et al.

plementary Medical Insurance Benefits for the Aged and Disabled." It covers a portion (typically 80%) of the cost of certain physician services, outpatient physical therapy, X-rays, laboratory tests, and other medical and health care. See §§ 1395k, 1395*l*, and 1395x(s) (1976 ed. and Supp. IV). Only persons 65 or older or disabled may enroll, and eligibility does not depend on financial need. Part B is financed by the Federal Supplementary Medical Insurance Trust Fund. See § 1395t (1976 ed. and Supp. IV). This Trust Fund in turn is funded by appropriations from the Treasury, together with monthly premiums paid by the individuals who choose voluntarily to enroll in the Part B program. See §§ 1395j, 1395r, and 1395w (1976 ed. and Supp. IV). Part B consequently resembles a private medical insurance program that is subsidized in major part by the Federal Government.

Part B is a social program of substantial dimensions. More than 27 million individuals presently participate, and the Secretary pays out more than $10 billion in benefits annually. Brief for Appellant 9. In 1980, 158 million Part B claims were processed. *Ibid.* In order to make the administration of this sweeping program more efficient, Congress authorized the Secretary to contract with private insurance carriers to administer on his behalf the payment of qualifying Part B claims. See 42 U. S. C. § 1395u (1976 ed. and Supp. IV). (In this case, for instance, the private carriers that performed these tasks in California for the Secretary were Blue Shield of California and the Occidental Insurance Co.) The congressional design was to take advantage of such insurance carriers' "great experience in reimbursing physicians." H. R. Rep. No. 213, 89th Cong., 1st Sess., 46 (1965). See also 42 U. S. C. § 1395u(a); S. Rep. No. 404, 89th Cong., 1st Sess., 53 (1965).

The Secretary pays the participating carriers' costs of claims administration. See 42 U. S. C. § 1395u(c). In return, the carriers act as the Secretary's agents. See 42 CFR § 421.5(b) (1980). They review and pay Part B claims for the

Secretary according to a precisely specified process. See 42 CFR part 405, subpart H (1980). Once the carrier has been billed for a particular service, it decides initially whether the services were medically necessary, whether the charges are reasonable, and whether the claim is otherwise covered by Part B. See 42 U. S. C. § 1395y(a) (1976 ed. and Supp. IV); 42 CFR § 405.803(b) (1980). If it determines that the claim meets all these criteria, the carrier pays the claim out of the Government's Trust Fund—not out of its own pocket. See 42 U. S. C. §§ 1395u(a)(1), 1395u(b)(3), and 1395u(c) (1976 ed. and Supp. IV).

Should the carrier refuse on behalf of the Secretary to pay a portion of the claim, the claimant has one or more opportunities to appeal. First, all claimants are entitled to a "review determination," in which they may submit written evidence and arguments of fact and law. A carrier employee, other than the initial decisionmaker, will review the written record *de novo* and affirm or adjust the original determination. 42 CFR §§ 405.807–405.812 (1980); *McClure* v. *Harris*, 503 F. Supp. 409, 411 (ND Cal. 1980). If the amount in dispute is $100 or more, a still-dissatisfied claimant then has a right to an oral hearing. See 42 U. S. C. § 1395u(b)(3)(C); 42 CFR §§ 405.820–405.860 (1980). An officer chosen by the carrier presides over this hearing. § 405.823. The hearing officers "do not participate personally, prior to the hearing [stage], in any case [that] they adjudicate." 503 F. Supp., at 414. See 42 CFR § 405.824 (1980).

Hearing officers receive evidence and hear arguments pertinent to the matters at issue. § 405.830. As soon as practicable thereafter, they must render written decisions based on the record. § 405.834. Neither the statute nor the regulations make provision for further review of the hearing officer's decision.[1] See *United States* v. *Erika, Inc., post,* p. 201.

---

[1] Hearing officers may decide to reopen proceedings under certain circumstances. See 42 CFR §§ 405.841–405.850 (1980).

## II

This case arose as a result of decisions by hearing officers against three claimants.[2] The claimants, here appellees, sued to challenge the constitutional adequacy of the hearings afforded them. The District Court for the Northern District of California certified appellees as representatives of a nationwide class of individuals whose claims had been denied by carrier-appointed hearing officers. 503 F. Supp., at 412–414. On cross-motions for summary judgment, the court concluded that the Part B hearing procedures violated appellees' right to due process "insofar as the final, unappealable decision regarding claims disputes is made by carrier appointees . . . ." *Id.*, at 418.

The court reached its conclusion of unconstitutionality by alternative lines of argument. The first rested upon the principle that tribunals must be impartial. The court thought that the impartiality of the carrier's hearing officers was compromised by their "prior involvement and pecuniary interest." *Id.*, at 414. "Pecuniary interest" was shown, the District Court said, by the fact that "their incomes as hearing officers are entirely dependent upon the carrier's decisions regarding whether, and how often, to call upon their services."[3] *Id.*, at 415. Respecting "prior involvement," the

---

[2] Appellee William McClure was denied partial reimbursement for the cost of an air ambulance to a specially equipped hospital. The hearing officer determined that the air ambulance was necessary, but that McClure could have been taken to a hospital closer to home. Appellee Charles Shields was allowed reimbursement for a cholecystectomy but was denied reimbursement for an accompanying appendectomy. The hearing officer reasoned that the appendectomy was merely incidental to the cholecystectomy. Appellee "Ann Doe" was denied reimbursement for the entire cost of a sex-change operation. The hearing officer ruled that the operation was not medically necessary.

[3] The District Court recognized that hearing officer salaries are paid from a federal fund and not the carrier's resources. *McClure v. Harris*, 503 F. Supp. 409, 415 (1980).

court acknowledged that hearing officers *personally* had not been previously involved in the cases they decided. But it noted that hearing officers "are appointed by, and serve at the will of, the carrier [that] has not only participated in the prior stages of each case, but has twice denied the claims [that] are the subject of the hearing," and that five out of seven of Blue Shield's past and present hearing officers "are former *or current* Blue Shield employees."[4] *Id.*, at 414. (Emphasis in original.) See also 42 CFR § 405.824 (1980). The District Court thought these links between the carriers and their hearing officers sufficient to create a constitutionally intolerable risk of hearing officer bias against claimants.

The District Court's alternative reasoning assessed the costs and benefits of affording claimants a hearing before one of the Secretary's adminstrative law judges, "either subsequent to or substituting for the hearing conducted by a carrier appointee." 503 F. Supp., at 415. The court noted that *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976), makes three factors relevant to such an inquiry:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's in-

---

[4] In this connection, the court referred to the judicial canon requiring a judge to disqualify himself from cases where a " 'lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter.' " 503 F. Supp., at 414–415, quoting Judicial Conference of the United States, Code of Judicial Conduct, Canon 3C(1)(b). The court found that application to hearing officers of standards more lax than those applicable to the judiciary posed "a constitutionally-unacceptable risk of decisions tainted by bias." 503 F. Supp., at 415.

Additionally, the court thought it significant that "no meaningful, specific selection criteria govern[ed] the appointment of hearing officers" and that hearing officers were trained largely by the carriers whose decisions they were called upon to review. *Ibid.*

terest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Considering the first *Mathews* factor, the court listed three considerations tending to show that the private interest at stake was not overwhelming.[5] The court then stated, however, that "it cannot be gainsaid" that denial of a Medicare beneficiary's claim to reimbursement may impose "considerable hardship." 503 F. Supp., at 416.

As to the second *Mathews* factor of risk of erroneous deprivation and the probable value of added process, the District Court found the record "inconclusive." 503 F. Supp., at 416. The court cited statistics showing that the two available Part B appeal procedures frequently result in reversal of the carriers' original disposition.[6] But it criticized these statistics for failing to distinguish between partial and total reversals. The court stated that hearing officers were required neither to receive training nor to satisfy "threshold criteria such as having a law degree." *Ibid.* On this basis it held that "it must be assumed that additional safeguards would reduce the risk of erroneous deprivation of Part B benefits." *Ibid.*

On the final *Mathews* factor involving the Government's interest, the District Court noted that carriers processed 124 million Part B claims in 1978. 503 F. Supp., at 416. The court stated that "[o]nly a fraction of those claimants pursue their currently-available appeal remedies," and that "there is no indication that anything but an even smaller group of claimants will actually pursue [an] additional remedy" of ap-

---

[5] "Eligibility for Part B Medicare benefits is not based on financial need. Part B covers supplementary rather than primary services. Denial of a particular claim in a particular case does not deprive the claimant of reimbursement for other, covered, medical expenses." *Id.*, at 416.

[6] "[Appellant] establish[es] that between 1975 and 1978, carriers wholly or partially reversed, upon 'review determination,' their initial determinations in 51–57 percent of the cases considered. Of the adverse determination decisions brought before hearing officers, 42–51 percent of the carriers' decisions were reversed in whole or in part." *Ibid.*

peal to the Secretary. *Ibid.* Moreover, the court said, the Secretary already maintained an appeal procedure using administrative law judges for appeals by Part A claimants. Increasing the number of claimants who could use this Part A administrative appeal "would not be a cost-free change from the status quo, but neither should it be a costly one." *Ibid.*

Weighing the three *Mathews* factors, the court concluded that due process required additional procedural protection over that presently found in the Part B hearing procedure. The court ordered that the appellees were entitled to a *de novo* hearing of record conducted by an administrative law judge of the Social Security Administration.[7] App. to Juris. Statement 36a. We noted probable jurisdiction, 454 U. S. 890 (1981), and now reverse.

## III

### A

The hearing officers involved in this case serve in a quasi-judicial capacity, similar in many respects to that of administrative law judges. As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities. *E. g.,* *Marshall* v. *Jerrico, Inc.,* 446 U. S. 238, 242–243, and n. 2 (1980). We must start, however, from the presumption that the hearing officers who decide Part B claims are unbiased. See *Withrow* v. *Larkin,* 421 U. S. 35, 47 (1975); *United States* v. *Morgan,* 313 U. S. 409, 421 (1941). This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification.[8] See *Gibson*

---

[7] The court added that appellees "are not entitled to further appeal or review of the Adminstrative Law Judge's decision." App. to Juris. Statement 36a.

[8] The Secretary's regulations provide for the disqualification of hearing officers for prejudice and other reasons. See 42 CFR § 405.824 (1980); App. 23–25. Appellees neither sought to disqualify their hearing officers nor presently make claims of *actual* bias. Tr. of Oral Arg. 34 (argument of counsel for appellees).

v. *Berryhill*, 411 U. S. 564, 578–579 (1973); *Ward* v. *Village of Monroeville*, 409 U. S. 57, 60 (1972). See also *In re Murchison*, 349 U. S. 133, 136 (1955) ("to perform its high function in the best way 'justice must satisfy the appearance of justice'") (quoting *Offutt* v. *United States*, 348 U. S. 11, 14 (1954)). But the burden of establishing a disqualifying interest rests on the party making the assertion.

Fairly interpreted, the factual findings made in this case do not reveal any disqualifying interest under the standard of our cases. The District Court relied almost exclusively on generalized assumptions of possible interest, placing special weight on the various connections of the hearing officers with the private insurance carriers.[9] The difficulty with this reasoning is that these connections would be relevant only if the carriers themselves are biased or interested. We find no basis in the record for reaching such a conclusion.[10] As previously noted, the carriers pay all Part B claims from federal, and not their own, funds. Similarly, the salaries of the hearing officers are paid by the Federal Government. Cf. *Mar-*

---

[9] Before this Court, appellees urge that the Secretary himself is biased in favor of inadequate Part B awards. They attempt to document this assertion—not mentioned by the District Court—by relying on the fact that the Secretary both has helped carriers identify medical providers who allegedly bill for more services than are medically necessary and has warned carriers to control overutilization of medical services. See Brief for Appellees 17–18.

This action by the Secretary is irrelevant. It simply shows that he takes seriously his statutory duty to ensure that only *qualifying* Part B claims are paid. See 42 U. S. C. § 1395y(a) (1976 ed. and Supp. IV); 42 CFR § 405.803(b) (1980). It does not establish that the Secretary has sought to discourage payment of Part B claims that *do* meet Part B requirements. Such an effort would violate Congress' direction. Absent evidence, it cannot be presumed.

[10] Similarly, appellees adduced no evidence to support their assertion that, for reasons of psychology, institutional loyalty, or carrier coercion, hearing officers would be reluctant to differ with carrier determinations. Such assertions require substantiation before they can provide a foundation for invalidating an Act of Congress.

*shall* v. *Jerrico, Inc., supra,* at 245, 251. Further, the carriers operate under contracts that require compliance with standards prescribed by the statute and the Secretary. See 42 U. S. C. §§ 1395u(a)(1)(A)–(B), 1395u(b)(3), and 1395u(b)(4) (1976 ed. and Supp. IV); 42 CFR §§ 421.200, 421.202, and 421.205(a) (1980). In the absence of proof of financial interest on the part of the carriers, there is no basis for assuming a derivative bias among their hearing officers.[11]

---

[11] The District Court's analogy to judicial canons, see n. 4, *supra,* is not apt. The fact that a hearing officer is or was a carrier employee does not create a risk of partiality analogous to that possibly arising from the professional relationship between a judge and a former partner or associate.

We simply have no reason to doubt that hearing officers will do their best to obey the Secretary's instruction manual:

" 'The individual selected to act in the capacity of [hearing officer] must not have been involved in any way with the determination in question and neither have advised nor given consultation on any request for payment which is a basis for the hearing. Since the hearings are of a nonadversary nature, be particularly responsive to the needs of unrepresented parties and protect the claimant's rights, even if the claimant is represented by counsel. The parties' interests must be safeguarded to the full extent of their rights; in like manner, the government's interest must be protected.

" 'The [hearing officer] should conduct the hearing with dignity and exercise necessary control and order. . . . The [hearing officer] must make independent and impartial decisions, write clear and concise statements of facts and law, secure facts from individuals without causing unnecessary friction, and be objective and free of any influence which might affect impartial judgment as to the facts, while being particularly patient with older persons and those with physical or mental impairments.

.        .        .        .        .

" 'The [hearing officer] must be cognizant of the informal nature of a Part B hearing . . . . The hearing is nonadversary in nature in that neither the carrier nor the Medicare Bureau is in opposition to the party but is interested only in seeing that a proper decision is made.' " App. 22, 31–32, quoting Dept. of HEW, Medicare Part B Carriers Manual, ch. XII, pp. 12–21, 12–29 (1980). Cf. *Richardson* v. *Perales,* 402 U. S. 389, 403 (1971) ("congressional plan" is that social security administrative system will operate essentially "as an adjudicator and not as an advocate or adversary").

B

Appellees further argued, and the District Court agreed, that due process requires an additional administrative or judicial review by a Government rather than a carrier-appointed hearing officer. Specifically, the District Court ruled that "[e]xisting Part B procedures might remain intact so long as aggrieved beneficiaries would be entitled to appeal carrier appointees' decisions to Part A administrative law judges."[12]   503 F. Supp., at 417.   In reaching this conclusion, the District Court applied the familiar test prescribed in *Mathews* v. *Eldridge,* 424 U. S., at 335.   See *supra,* at 193–195.   We may assume that the District Court was correct in viewing the private interest in Part B payments as "considerable," though "not quite as precious as the right to receive welfare or social security benefits."   503 F. Supp., at 416.   We likewise may assume, in considering the third *Mathews* factor, that the additional cost and inconvenience of providing administrative law judges would not be unduly burdensome.[13]

We focus narrowly on the second *Mathews* factor that considers the risk of erroneous decision and the probable value, if any, of the additional procedure.   The District Court's reasoning on this point consisted only of this sentence:

"In light of [appellees'] undisputed showing that carrier-appointed hearing officers receive little or no formal training and are not required to satisfy any threshold cri-

---

[12] The claim determination and appeal process available for Part A claims differs from the Part B procedure.   See generally 42 CFR part 405, subpart G (1980), as amended, 45 Fed. Reg. 73932–73933 (1980).   See also *United States* v. *Erika, Inc., post,* at 206–207, and nn. 8 and 9.

[13] No authoritative factual findings were made, and perhaps this conclusion would have been difficult to prove.   It is known that in 1980 about 158 million Part B claims—up from 124 million in 1978—were filed.   Even though the additional review would be available only for disputes in excess of $100, a small percentage of the number of claims would be large in terms of number of cases.

teria such as having a law degree, it must be assumed that additional safeguards would reduce the risk of erroneous deprivation of Part B benefits." 503 F. Supp., at 416 (footnote omitted).

Again, the record does not support these conclusions. The Secretary has directed carriers to select as a hearing officer

> " 'an attorney or other *qualified* individual with the ability to conduct formal hearings and with a general understanding of medical matters and terminology. The [hearing officer] must have a *thorough knowledge* of the Medicare program and the statutory authority and regulations upon which it is based, as well as rulings, policy statements, and general instructions pertinent to the Medicare Bureau.'" App. 22, quoting Dept. of HEW, Medicare Part B Carriers Manual, ch. VII, p. 12–21 (1980) (emphasis added).

The District Court did not identify any specific deficiencies in the Secretary's selection criteria. By definition, a "qualified" individual already possessing "ability" and "thorough knowledge" would not require further training. The court's further general concern that hearing officers "are not required to satisfy any threshold criteria" overlooks the Secretary's quoted regulation.[14] Moreover, the District Court apparently gave no weight to the qualifications of hearing officers about whom there is information in the record. Their qualifications tend to undermine rather than to support

---

[14] The District Court's opinion may be read as requiring that hearing officers always be attorneys. Our cases, however, make clear that due process does not make such a uniform requirement. See *Vitek* v. *Jones*, 445 U. S. 480, 499 (1980) (POWELL, J., concurring in part); *Parham* v. *J. R.*, 442 U. S. 584, 607 (1979); *Morrissey* v. *Brewer*, 408 U. S. 471, 486, 489 (1972). Cf. *Goldberg* v. *Kelly*, 397 U. S. 254, 271 (1970). Neither the District Court in its opinion nor the appellees before us make a particularized showing of the additional value of a law degree in the Part B context.

the contention that accuracy of Part B decisionmaking may suffer by reason of carrier appointment of unqualified hearing officers.[15]

"[D]ue Process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). We have considered appellees' claims in light of the strong presumption in favor of the validity of congressional action and consistently with this Court's recognition of "congressional solicitude for fair procedure . . . ." *Califano* v. *Yamasaki*, 442 U. S. 682, 693 (1979). Appellees simply have not shown that the procedures prescribed by Congress and the Secretary are not fair or that different or additional procedures would reduce the risk of erroneous deprivation of Part B benefits.

## IV

The judgment of the District Court is reversed, and the case is remanded for judgment to be entered for the Secretary.

*So ordered.*

---

[15] The record contains information on nine hearing officers. Two were retired administrative law judges with 15 to 18 years of judging experience, five had extensive experience in medicine or medical insurance, one had been a practicing attorney for 20 years, and one was an attorney with 42 years' experience in the insurance industry who was self-employed as an insurance adjuster. Record, App. to Defendants' Reply to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment 626, 661–662, 682–685.