**UNITED STATES, Appellee,**

v.

**Chad S. HAGEN, Master Sergeant U.S. Army, Appellant.**

No. 53,245.
CM 445028.

U.S. Court of Military Appeals.

Sept. 25, 1987.
Certiorari Denied Feb. 22, 1988.
See 108 S.Ct. 1015.

*berson* (on brief); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Byron J. Braun, Captain John F. Burnette.*

*Opinion of the Court*

COX, Judge:

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of larceny, wrongful sale of military property, attempted wrongful sale of military property, and conspiracy to sell military property, in violation of Articles 121, 108, 80, and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 921, 908, 880, and 881, respectively.[1] We granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY FAILING TO COMPEL THE CONVENING AUTHORITY TO TESTIFY CONCERNING HIS DECISION TO REFER TO TRIAL CHARGES AGAINST APPELLANT CONTRARY TO THE ADVICE OF HIS STAFF JUDGE ADVOCATE.

Appellant's theory of error is considerably more involved than the issue would admit. He argues essentially that the convening authority was vindictive and discriminatory in his decision to cause or persist in appellant's prosecution, such that appellant's rights under the Due Process Clause of the Fifth Amendment (which includes the concept of Equal Protection) of the United States Constitution were violated. In support of these claims, appellant cites the convening authority's actions in the following particulars: (1) his decision not to prosecute others associated with the underlying course of criminal conduct;

(2) certain of his comments to a group of noncommissioned officers; (3) his resistance to securing a defense-requested expert witness; (4) his refusal to be interviewed by civilian defense counsel; and (5) his failure to follow the acting staff judge

For Appellant: *Captain Richard J. Anderson* (argued); *Lieutenant Colonel Paul J. Luedtke* and *Major Dale K. Marvin* (on brief); *Colonel Brooks B. La Grua* and *Major John E. King.*

For Appellee: *Captain George R. Gillette* (argued); *Colonel Norman G. Cooper* and *Lieutenant Colonel Gary F. Ro-*

---

1. His sentence to a bad-conduct discharge, total forfeitures, confinement for 30 months, and reduction to Private (E-1) was approved by the convening authority; and the findings and sentence were affirmed by the Court of Military Review in an unpublished memorandum opinion.

advocate's advice to withdraw the charges. The issue merely states the fallback position that, since it was appellant's burden to establish vindictiveness or selectivity, if the other indications of record were not sufficient in and of themselves to carry that burden, then at least they raised enough of an inference of impropriety to warrant a judicial examination of the convening authority to ascertain his motives.[2] Finding no error in either the convening authority's conduct or the military judge's decision, we affirm.

## I

A full development of the facts and chronology of the case is necessary to put the granted issue in perspective. The Government's evidence was that, during the period March to July, 1982, at Fort Benning, Georgia, appellant stole quantities of "inert" hand grenades and other munitions from the Government. In addition, First Lieutenant Scott L. Johnston, in collaboration with appellant, converted these grenades into live explosives. Finally, in furtherance of the joint enterprise, appellant sold a number of these reconstituted grenades on four occasions, and he attempted a fifth sale.[3]

The case against appellant was initiated by agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF), United States Department of Treasury. They gained appellant's acquaintance and confidence through an informant. All transactions of which appellant was convicted and the attempt were made directly to ATF agents. Appellant was led to believe that he was supplying munitions to the Mafia. The Criminal Investigation Command (CID) at Fort Benning was first notified of the operation after it was in progress. CID agents then got involved in taking statements and other nonoperational aspects of the investigation. Basically, the Government's evidence consisted of: a description of appellant's conduct and statements as observed by one of the ATF agents who participated in the transactions; audio and videotapes of portions of the transactions; the contraband as received or seized from appellant; and appellant's sworn, written confession.

Like appellant, Johnston was a range control officer and had access to and control over various types of ammunition and

2. Presumably appellant would have been equally satisfied if the military judge had simply abated the proceedings until the convening authority voluntarily agreed to testify.

3. The defense also made allegations about Captain David E. Rittenhouse, who had been the convening authority's aide-de-camp during a previous assignment. The contention was that Rittenhouse was involved in some way with the case but that the general treated him with partiality due to their association and friendship. Captain Rittenhouse resigned his commission, apparently after his name popped up in the investigation; no action was taken against him. The only thing that links this resignation to the investigation is the sequence of events. Strictly speaking, nothing in the record of trial supports the suggestion that Rittenhouse was involved in any misconduct. Countering appellant's naked claim, trial counsel *proffered* that Rittenhouse had owned a semiautomatic weapon; that he sold it to Johnston; that Johnston converted it to a fully automatic weapon; and that the CID determined that Rittenhouse had committed no crime.

The only other information that can be gleaned comes from the allied papers. One of appellant's admissions (received as an exhibit at the investigation under Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832, but not admitted at trial) essentially corroborates trial counsel's proffer. According to the statement:

> The second one [described as a fully-automatic Ingram] I sold originally came from CPT RITTENHOUSE. He was asking around where I work if somebody wanted to buy it. At the time he wanted to sell the weapon it was a legal weapon and was semiautomatic. He left it at the place of work and LT JOHNSTON took it [and] fixed it to fire fully automatic and gave it to me and I sold it to the undercover AT and F agent.

Rittenhouse's account (found in the allied papers) corroborates the transfer of what was described as an "RPB 9mm firearm" to appellant for the purpose of resale. Later, appellant gave Rittenhouse the proceeds of the sale ($400). Appellant did not provide Rittenhouse a receipt and would not reveal to whom he had sold it. Rittenhouse denied having any knowledge of the illegal conversion of the weapon.

Apart from civilian defense counsel's general assertion that there was something smelly in all of this, there is no other information about Rittenhouse and his activities before us.

weapons. Apart from appellant's assertions and confessions, relatively little is shown in this record about Johnston's activities. Unlike appellant, Johnston was not personally involved in the transfer of contraband to ATF agents. Further, upon being questioned by the CID, Johnston exercised his rights and declined to make a statement. If he made a statement at another time, this record does not so indicate.

During his unwitting contacts with federal agents, appellant kept mentioning that he had a partner; but, up until the time of his arrest, he never revealed Johnston's name. The agents worked hard to get an introduction to this partner. On at least one occasion, they flew appellant to a location where they wined and dined him, and they introduced him to some supposedly "heavy people" (ATF agents posing as mafiosi) in an unsuccessful attempt to "loosen him up" and get the introduction to Johnston. Even after appellant was apprehended, had agreed to work for the agents, and was wired for sound, they were unable to get any incriminating statements from Johnston. To be sure, there is some indication in this record of other, independent evidence against Johnston, but it is largely peripheral, at least as to the more serious charges. There can be no doubt, based on this record or any other facts or evidence suggested by the defense, that appellant's testimony against Johnston would have been the heart of any military prosecution of Johnston.

The convening authority referred appellant's charges to the court-martial on August 18, 1982. Thereafter, pursuant to defense request and with the concurrence of the Government, the military judge ordered that a medical board be convened to assess appellant's sanity. On November 4, 1982, Gerson Z. Escondo, M.D., the psychiatrist who constituted the board, reported that

at the time of [the] alleged offense, as a result of post-traumatic stress disorder, [appellant] *might lack the capacity to appreciate the criminality of his conduct ... [and] might lack the capacity to conform his conduct to the requirement of the law.*

(Emphasis added.) Dr. Escondo concluded, however, that appellant was competent to stand trial.

In the meantime, Johnston had been charged with conspiracy, larceny, conduct unbecoming an officer and a gentleman, unlawfully possessing hand grenades, and unlawfully making destructive devices, in violation of Articles 81, 121, 133, and 134, UCMJ, 10 U.S.C. §§ 881, 921, 933, and 934, respectively. On October 22, 1982, Johnston submitted a "Resignation for the Good of the Service," under the provisions of chapter 5, Army Regulation 635–120.

On November 24, 1982, the acting staff judge advocate formally advised the convening authority to recommend approval of Johnston's request (secretarial approval was required and subsequently obtained). The reasons cited by the acting staff judge advocate were:

(1) That appellant's credibility would be severely affected by the sanity board's finding that he might have lacked capacity to appreciate the wrongfulness of his conduct; and

(2) That the delay occasioned by defense-requested psychiatric evaluations in appellant's case was prejudicing Johnston's speedy-trial rights.

The acting staff judge advocate also noted that Johnston's commanders had recommended approval of his resignation and of a discharge under conditions other than honorable. Consistent with the advice of his subordinates, the convening authority recommended approval of the resignation.[4]

---

4. A newspaper account from *The Columbus Ledger,* May 6, 1983, which is included among the allied papers, reports:

Arrested in connection with Hagen was Fort Benning 1st Lt. Scott L. Johnston, charged with possession, transfer and manu-

facturing of unregistered machine guns, an AFT agent said.

But Wetzel dropped military charges against Johnston because there wasn't enough evidence to get a conviction, said Frank Martin, Johnston's Columbus attorney.

In view of the inconclusive nature of Dr. Escondo's findings, appellant had indeed sought clarification of his mental status. The defense requested an examination by a specialist in the field of what it termed "Viet Nam Delayed Stress Syndrome," allegedly a type of post-traumatic stress disorder. The Government initially sought to facilitate the defense request. Prior to the first session of the court-martial, which occurred on November 29, 1982, the Government offered the services of Dr. Armitage, supposedly the only Army forensic psychiatrist in the continental United States. However, Dr. Armitage became unavailable due to a death in the family, and, upon further inquiry, the Government learned that there was no recognized psychiatric specialty in the area of post-traumatic stress disorder. Therefore, the Government offered the services of any other psychiatrist, especially Dr. Randall J. Brewer, Chief of Psychiatry at Fort Gordon, who happened to be readily available. The defense declined the offer.

Before the second session of the court-martial, the defense identified a civilian expert, Dr. Dave M. Davis of Atlanta, Georgia, who met their criteria, and they requested that Major General Wetzel, the convening authority, make him available. Counsel estimated the cost at $4000. General Wetzel declined. At that second hearing, on December 15, 1982, the defense renewed its request before the military judge. The judge also refused to order the employment of Dr. Davis and held that the convening authority had not abused his discretion in failing to accede to the request.

The next session of the court-martial was not held until March 28, 1983. The defense did not there renew its motion for the procurement of Dr. Davis but indicated that appellant had raised a little over $1000 and had himself examined by Dr. Davis. Defense counsel reported that, though his written report was not yet available, Dr. Davis had informed him "that he concurs in

what Dr. Escondo's findings were and goes a little beyond that." The defense also notified the military judge that appellant was continuing to receive psychiatric treatment from Dr. Escondo.

As previously indicated, appellant's charges were *referred* to court-martial on August 18, 1982, *with* the staff judge advocate's recommendation. Some 8 months later, on April 21, 1983 (after Johnston's resignation had been approved), the acting staff judge advocate recommended *withdrawal* of the charges against appellant. The recommendation was prompted by a prosecutorial evaluation of the strength of the evidence (*i.e.*, of appellant's sanity) and the projected costs. General Wetzel disregarded the recommendation, and the prosecution continued.

By the next session of the court-martial, on May 11, 1983, the defense had again asked General Wetzel to provide Dr. Davis as a witness, and again he had refused. Defense counsel had also unsuccessfully sought to interview General Wetzel and now wished to call him as a witness in the court-martial to "determine whether or not he has, in fact, abused his discretion" in failing to provide the funds to obtain Dr. Davis' testimony. The issue at this point of the proceedings was not yet convening authority misconduct, but the materiality of the witness, Dr. Davis.

But now the Government "concede[d]" that Dr. Davis had become "an essential witness." The Government's new position was that, when Dr. Davis was just another psychiatrist, he was not a material witness. However, appellant's action in having himself examined, such that Dr. Davis formed an opinion as to his sanity, made Dr. Davis' testimony material. In this circumstance, the Government did not object to producing Dr. Davis. The Government did, however, disagree with having to produce him at the rate contracted for by appellant. The fee request was by then down to $3,000 (appar-

Johnston left the Army on a less-than-honorable discharge, Martin said.

Johnston pleaded guilty to two counts of possession of unregistered firearms in the

Montgomery, Ala., federal court Feb. 1. He was sentenced to five years probation.

There is no other mention of a federal prosecution of Johnston in the record.

ently the balance after what appellant had already invested). The session of the court-martial ended with the judge ordering the Government to produce Dr. Davis on penalty of abatement. The fee arrangement was not resolved.

Before the next session of the court-martial, the prosecution and the defense entered into what they termed a "stipulation" that the court-martial might appoint Dr. Armitage (who, in the intervening 7 months, again had become available) as an expert witness. By the time of the hearing, however, on June 20, 1983, the defense withdrew from this agreement. The situation was that Dr. Escondo's expected testimony had evolved to the point of virtual identity with Dr. Davis' opinion, and the defense opposed any further mental evaluation of appellant. It was the Government, at that point, that wanted further examination. The judge denied the Government's effort. Also at that session, the Government announced its willingness to pay Dr. Davis at the rate of $350 per day—purportedly the standard federal fee for expert witnesses.

At a session of the court-martial held on July 26, 1983, the defense, for the first time, moved to dismiss the charges and specifications "based on ... prosecutorial vindictiveness." The history of General Wetzel's resistance to providing funds for Dr. Davis was reiterated, as were the general's refusal to dismiss the charges as recommended by the acting staff judge advocate and his alleged preferential treatment of Captain Rittenhouse (*see* n. 3, *supra*) and Lieutenant Johnston. Further, the defense proffered that it could produce witnesses who would testify that General Wetzel had stated, at a breakfast for senior NCOs, that

> Master Sergeant Hagen will be prosecuted. The Army has spent over $10,-000.00 in preparing this case, and Master Sergeant Hagen will be prosecuted.

For purposes of the motion, the military judge accepted the truth of the defense's factual allegations. Nonetheless, he denied the motion, apparently on the ground that the evidence failed to raise an issue of misconduct or vindictiveness.

After the prosecution presented its case, as previously summarized, on July 26 and August 1, 1983, the defense rested without presenting any evidence on the merits.

## II

■ Appellant's selective-prosecution argument (equal protection) apparently was not articulated at trial. As we noted in *United States v. Garwood*, 20 M.J. 148, 154 (C.M.A.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 456 (1985), *quoting United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974):

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

An accused must show more than a mere possibility of selective prosecution; he must show discriminatory intent. *Wayte v. United States*, 470 U.S. 598, 607–10, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985); *cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ Appellant's theory on appeal is that he alone was singled out for prosecution in retaliation for his legitimate attempts to exercise his constitutional right to a trial. The record does not support him. Appellant cannot criticize the convening authority for failing to prosecute Captain Rittenhouse when appellant himself provided the refutation of Rittenhouse's criminality. The Rittenhouse matter is, in truth, nothing but a smoke screen. *See* n. 3, *supra*.

With regard to Johnston, we conclude that General Wetzel had a legitimate basis for treating him differently. The reasons cited by the acting staff judge advocate for recommending acceptance of the resignation speak for themselves and are entirely justifiable. In retrospect, it may be noted that appellant's trial on the merits did not actually commence until 8 months after the general's action on the Johnston petition. Moreover, it cannot be determined from this record whether General Wetzel was aware that Johnston might yet be subject to federal civilian prosecution at the time he made his recommendation. *See* n. 4, *supra.* Thus, we conclude that appellant was not selectively prosecuted.

### III

Appellant next contends that the decision to prosecute him was in *retaliation* for his exercise of certain constitutional rights. Ordinarily, the forum for vindicating oneself in a criminal justice system is the trial. The law regarding claims of prosecutorial vindictiveness is well-settled. Public officials making decisions to prosecute exercise broad discretion. *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Courts are hesitant to review decisions whether to prosecute. *Wayte v. United States, supra* 470 U.S. at 607–08, 105 S.Ct. at 1531. There is a strong presumption that the convening authority performs his duties as a public official without bias. *Cf. Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982); *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). A party complaining of a public official's bias bears the burden of rebutting that presumption. *Schweiker v. McClure, supra,* 456 U.S. at 196, 102 S.Ct. at 1670. As with a charge of selective prosecution, an accused must show more than a mere possibility of vindictiveness; he must show discriminatory intent. *United States v. Andrews,* 633 F.2d 449 (6th Cir.1980) (en banc). Once a *prima facie* case of vindictiveness is made out, however, the burden shifts to the prosecution to disprove the misconduct. *United States v. Krezdorn,* 718 F.2d 1360, 1365 (5th Cir.1983) (en banc), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984).

In his attempt to show that the convening authority was vindictive, appellant cumulates his assertions. We have already rejected his claim that he was singled out for prosecution in bad faith. We also view the convening authority's various decisions with respect to Dr. Davis as entirely correct in law and fact. Appellant had no right to select the expert of his choice and bind the Government to pay for him. *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985); *United States v. Mustafa,* 22 M.J. 165, 169 (C.M.A.), *cert. denied,* — U.S. —, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Both the convening authority and the military judge were within their discretion in concluding that adequate experts were made available to the defense. In any event, once Dr. Davis became a concededly material witness, all appropriate measures were undertaken to assure his presence. It was the defense itself that elected to forego the psychiatric defense; the convening authority's conduct was not objectionable.

Next, the general's alleged remarks to the NCOs concerning the costs of prosecution affords appellant a launching pad for his imagination. Assuming, *arguendo,* the comments were even uttered, they are neutral on their face. Surely a willingness to pursue justice, despite the cost, is not a ground for reversal. It would be a strange world indeed if only inexpensive prosecutions could be maintained.

Appellant, however, extrapolates from this alleged statement the vindictive motive to punish him for attempting to force the Government to spend money on his psychiatric defense. A word about appellant's bizarre theory of vindictiveness is in order. First, the issue he assigns, which identifies the convening authority's "decision to refer to trial charges against appellant contrary to the advice of his staff judge advocate," is inaccurate. As previ-

ously noted, the convening authority's decision to refer appellant's charges to a court-martial was made on August 18, 1982, *pursuant to the advice of his staff judge advocate.* Appellant did not begin requesting psychiatric evaluations until *after* the referral to court-martial. It was not until April 21, 1983, that the *acting* staff judge advocate recommended *withdrawal* of the charges, based in part on potential expense. It was this advice that the convening authority rejected.

Thus, as reformulated, appellant's claim of *retaliation* for exercising his rights, *i.e.,* running up the bill, must be this:

(1) General Wetzel would have, in the ordinary course of events, dismissed the charges against appellant, and

(2) The reason he did not withdraw the charges was that he was punishing appellant for requesting evaluation by Dr. Davis.

This is patently absurd. Appellant was a senior noncommissioned officer in the convening authority's command who had been caught red-handed by federal agents in diverting government property and selling explosives to what he thought was an ongoing criminal enterprise. It is ridiculous to assume that General Wetzel would inexorably have dismissed these serious charges if only appellant had not sought psychiatric evaluation. Retaliation through nonwithdrawal, at least under these circumstances, simply beggars logic.

■■■ The argument that the general's rejection of the acting staff judge advocate's recommendation demonstrates impure motive is also fallacious. By all accounts, appellant was a crack NCO. He was in charge of approximately 100 other NCOs, not to mention being a highly decorated combat veteran. Even appellant's own witnesses, called during the sentencing phase to show that he had his quirks, cited his extreme competence and professionalism. Apparently, the general had a better appreciation than did the acting staff judge advocate of just how impressive

lay testimony about an accused's behavior can be. When there is substantial evidence that an accused is sane, notwithstanding that there may also be evidence to the contrary, there is nothing wrong with submitting the matter to an impartial factfinder.

We conclude that this record fails to show that the convening authority was vindictive or selective in his decision to cause appellant to be prosecuted.

## IV

■■■ It remains to be resolved whether the evidence was sufficient nevertheless to require that the convening authority be called to the stand to justify his decisions. As previously indicated, appellant's counsel had unsuccessfully sought a pretrial interview of the convening authority for this same purpose. Counsel's explanations to the military judge make it quite clear that counsel was on a fishing expedition, hoping to get the convening authority to make some statement that could be used against him to bolster their argument of vindictiveness/selectivity.

Evidently, few cases discuss when, if ever, a *prosecutor* can be called to the stand by a defendant and made to justify his official actions. The presumption of propriety would indeed be trivial if this could be done in any but the most extraordinary situations. Therefore, we hold that, as a general rule, government officials cannot be "called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment" or its equivalent. *United States v. Falk,* 479 F.2d 616, 620 (7th Cir.1973) (en banc). If, on the other hand,

> a defendant alleges intentional purposeful discrimination *and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose,* ... a different question is raised.

*Id.* at 620–21 (emphasis added).[5]

We are satisfied that this record reveals no basis for the remedy of hailing the

---

**5.** *Cf. United States v. Krezdorn,* 718 F.2d 1360      (5th Cir.1983) (en banc), *cert. denied,* 465 U.S.

convening authority into court and requiring him to justify his motives in referring charges to a court-martial (or, as here, in not withdrawing them). The crimes of which appellant was accused were serious, and the available evidence was substantial. The underlying facts appellant alleges to support his claim of vindictive prosecution were not disputed. It is the inferences to be drawn from the facts, however, that do not support the conclusion he seeks.

We would not be surprised, indeed, to learn that the convening authority was upset at discovering this breach of duty and trust by one of his senior NCOs. But a convening authority's mere shock or outrage at criminal conduct within his command is not enough to disqualify him from forwarding cases to the institution created for the very purpose of vindicating unjustly charged servicemembers—the court-martial. If it were otherwise, very few serious offenses could ever be prosecuted, a result not consistent with logic. Significantly, there has been no suggestion that the convening authority's supposed attitude toward appellant or the offenses was communicated to the court members or otherwise tainted the proceedings.[6]

The decision of the United States Army Court of Military Review is affirmed.

---

1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984), where the prosecutor's action in securing an indictment on an additional charge, after the original charges were reversed on appeal, made out "[a] prima facie case of prosecutorial vindictiveness." 718 F.2d at 1362. In those circumstances, the Court of Appeals commented:

If the defendant challenges as vindictive a prosecutorial decision to increase the number or severity of charges following a successful appeal, the court must examine the prosecutor's actions in the context of the entire proceedings. *If any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of charges was motivated by some purpose other than a vindictive desire to deter or punish appeals, no presumption of vindictiveness is created.* In trying the issue of vindictiveness, *the prosecutor may offer proof* of the sort suggested in *Hardwick* [*v. Doolittle,* 558 F.2d 292 (5th Cir.1977), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978) ] that

**SULLIVAN, Judge (concurring):**

The conduct of the convening authority in this case and other cases deeply troubles this Court. *See United States v. Thomas,* 22 M.J. 388 (C.M.A.1986). Accordingly, it is appropriate within the context of the case at bar to give some guidance on this officer's role in the military justice system.

The actions a convening authority takes in performing duties with regard to the administration of our military justice system constitute a solemn and sacred exercise of power. *Id.* at 400. That is one reason why it is a criminal offense under the Code not only to unlawfully influence the actions of a court-martial but also the action of a convening, approving, or reviewing authority. Arts. 37 and 98, Uniform Code of Military Justice, 10 U.S.C. §§ 837 and 898, respectively. The power to bring or to dismiss criminal charges against a servicemember must be exercised strictly in accordance with the law. *See Cooke v. Orser,* 12 M.J. 335, 338 (C.M.A.1982).

A convening authority must be impartial and independent in exercising his authority under the Code. The very perception that a person exercising this awesome power is dispensing justice in an unequal manner or is being influenced by unseen superiors is wrong. We must insure our system of jus-

---

as a matter of fact his actions were not vindictive. The burden of proof (by a preponderance of the evidence) remains on the defendant who raised the affirmative defense. If, on the other hand, the course of events provides *no objective indication* that would allay a reasonable apprehension by the defendant that the more serious charge was vindictive, i.e., inspired by a determination to "punish a pesky defendant for exercising his legal rights," a presumption of vindictiveness applies which cannot be overcome unless the government proves by a preponderance of the evidence that events occurring since the time of the original charge decision altered that initial exercise of the prosecutor's discretion.

*Id.* at 1365 (emphasis added). *Krezdorn,* then, was a case in which the burden of proof had already shifted, and the prosecutor's failure to come forward at that point and explain his conduct would have prejudiced the prosecution.

**6.** I agree with the opinion of my Brother, Judge Sullivan.

tice is free from even the appearance of command influence. *See generally United States v. Brice*, 19 M.J. 170, 172 n. 3 (C.M.A.1985) (principal opinion); *United States v. Rosser*, 6 M.J. 267, 273 n. 19 (C.M.A. 1979).

In the case at bar, a perception might exist that appellant and a fellow servicemember involved in the same criminal investigation received unequal treatment. However, on closer examination, we find this perception is wrong. The record shows that the convening authority properly exercised his powers by charging appellant with a crime and accepting the resignations of others. However, it would have been better from a perception standpoint if the convening authority had recused himself in the case of his former personal aide and transferred his court-martial powers to another competent convening authority. Art. 22(b), UCMJ, 10 U.S.C. § 822(b). *See* R.C.M. 401 (c), Manual for Courts-Martial, United States, 1984.

Furthermore, in the case at bar the convening authority made breakfast remarks to noncommissioned officers concerning the pending case. The record clearly demonstrates that there was no prejudice to appellant resulting from this incident. However, this incident would not have been an appellate issue if the convening authority had not commented on this pending case. There is a good reason why Supreme Court justices, federal prosecutors, jurors, judges, courts-martial members, and others intimately involved with the administration of justice answer "no comment" when they are asked for their views on a pending case. A.B.A. Standards, *Fair Trial and Free Press* §§ 8–1.1 to 8–2.3 (1978). Similarly, public comments on a pending case by a convening authority to the press or to subordinate members of his command can only serve questionable purposes and could prejudice an accused in some situations.

This Court also notes that one of the true cornerstones of the fair system of justice that our servicemembers enjoy is the independence of the convening authority. His honor, professionalism, and integrity guarantee fairness and openness in the exercise of the courts-martial power. A frequent observer of the system knows that, when the convening authority makes a decision exercising power in this area, there are no unseen strings or superiors influencing his actions. Moreover, to influence a convening authority's exercise of power by exerting influence from a superior or on a superior's behalf either directly or indirectly is to violate the law. Arts. 37 and 98. A convening authority has to decide a case without any suggestion as to how the superior wants the case to be resolved. Art. 34, UCMJ, 10 U.S.C. § 834. If the superior of a convening authority wants to properly influence the outcome of a criminal case, let that superior operate in the open and under the law by assuming the power of the court-martial convening authority under Article 22.

Likewise, no indirect pressure to influence the convening authority's action should be exerted from above through legal channels. The convening authority may seek legal advice through his assigned legal advisor or through superior legal officers including the Judge Advocate General. Art. 6(b), UCMJ, 10 U.S.C. § 806(b). But let only legal advice, not policy suggestions, from the convening authority's superior flow through these channels.

Command influence is a threat to justice and fairness in the operation of the code. This evil can emanate from within or outside the system. The most obvious case is where the convening authority taints the proper operation of the courts-martial system in his command by exerting influence outside the scope of his authorized power. *See United States v. Thomas, supra.* Command influence can also come from above and improperly impact on the decision of the convening authority himself. *See generally* H. Moyer, *Justice and the Military* §§ 3–111 to 3–113, 3–136, 3–137 (1972). Neither form can be tolerated.

A typical general or flag officer exercising convening-authority power will almost always have superiors, higher-ranking military officers or civilians in policy positions.

These superiors as well must refrain from sending signals down the chain of command as to expected results in a criminal case. Real or perceived policy considerations in the operation of military departments have no place in determining the guilt or innocence of an individual charged with a crime under the laws of our land. Superior commanders and staff officers, as well as military or civilian legal officers, must never, directly or indirectly, interfere with a convening authority's exercise of his lawful duty. The convening authority must make his or her own decision on the case. It is not only unprofessional but a fraud on the system for a superior to "send the word" down to a convening authority as to a desired result in a criminal case which will please the leadership of our armed forces.

EVERETT, Chief Judge (concurring):

I concur with the principal opinion as well as with Judge Sullivan's excellent concurring opinion.